Filed 6/18/21  In re Katie T CA1/4

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re Katie T. et al., Persons Coming Under the Juvenile Court Law. | |
| MENDOCINO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ILENE K.,<br><br>    Defendant and Appellant. | A159220, A160139<br><br>(Mendocino County Super. Ct. Nos. SCUK-JVSQ-19-17729-02; SCUK-JVSQ-19-17728-02; SCUK-JVSQ-19-17074-03; SCUK-JVSQ-19-17075-03; SCUK-JVSQ-19-17076-03) |

In these consolidated appeals, appellant Ilene K. (Mother) asks us to resolve a placement issue for her youngest child, Katie T., under the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA), as well as to review the sufficiency of the evidence to support the disposition orders removing all five of her children from her custody.  Katie T., a member through her father of a recognized Native American tribe, was placed with a tribally approved extended family member, her paternal aunt, in San Diego. Mother contends this placement was not in "reasonable proximity" to Katie T.'s home, as required by ICWA, and seeks Katie T.'s return, if not

1

home, then at least to Mendocino County.  (25 U.S.C. § 1915(b).)  Mother's stance pits her against Katie T.'s tribe, which wants her to stay in San Diego. We shall affirm the decision to keep her in San Diego, finding it was not contrary to ICWA and not an abuse of discretion.

Mother further challenges the sufficiency of the evidence to support the disposition orders removing all five children from her care.  We conclude Mother's current inability to provide adequate and stable housing for her children, combined with her lifelong mental health issues, often left untreated, and her history of substance abuse, provided substantial evidence to support the removal orders.

## I.  BACKGROUND

### A. *The Detention*

In July 2019, Mother and her partner, Antonio T., moved with Mother's five children (ranging in age from two to nine) to Covelo from Willits.  The three oldest children are boys; the two youngest are girls.  The family was staying temporarily with Mother's sister, Kate K., and her mother, Susan K., in a house owned by Kate K., until they could find their own housing in Covelo.  Tragically, Antonio T. died as soon as they moved in with Kate K. He was the biological and presumed father of Katie T., age two, and the presumed father of J.L., a girl age three.

Kate K.'s house was apparently connected through corridors with one or more mobile homes.  The compound had a detached carport.  After Antonio T.'s death, Mother moved into a tent in the carport so she could grieve the loss of her partner without, she thought, adversely influencing her children.

Less than two months after Antonio T.'s death, on September 9, 2019, Mother's five children were detained by two social workers from the Mendocino County Health and Human Services Agency (Agency) and a social

2

worker from the Round Valley Indian Tribes, in response to a referral for general neglect, severe neglect, and physical abuse. The children themselves were dirty, as was the home where they were staying, and it presented dangers to the children. The detention report described a heavily cluttered house in unsanitary and ill-repaired condition. The detention report also identified potential dangers to the children on the premises, including sharp tools, a closed pocketknife within their reach, and a pile of wood, boards with nails sticking out and metal roofing outside. A caged possum and a caged crow reportedly lived in the house with the family, which violated tribal customs. Meanwhile, Mother slept in a tent in the carport, away from the house.

In addition to the conditions in the house, Mother tested presumptively positive for methamphetamine, and she admitted she had used methamphetamine at a party a day or two before. This was a special concern because she and Antonio T. had just received the children back into their custody less than six months earlier from a 2017 dependency case that involved methamphetamine use by both of them. Katie T. had been just one month old when she was detained in the 2017 dependency before being returned to Mother and Antonio T. in March 2019. Her first placement, along with the other children, had been with Kate K., who surrendered her back to the Agency within 24 hours because she could not care for a "colicky infant" along with the other four children. Katie T. was returned to Kate K. from the age of six months until she was almost two years old. She was in a total of four placements during the 2017 dependency.[1]

_____

[1] Mother also was subject to a 2014 dependency petition for her three boys after two of them, ages one and three, were found walking on a country road wearing nothing but their diapers, while Mother was "passed out" at

3

Mother is also bipolar, diagnosed since childhood, and has also been diagnosed with PTSD and borderline personality disorder. She tends to resist taking her psychotropic medications and admittedly had been off her medications since Antonio T.'s funeral. The detention report described Mother's behavior as "erratic" and "agitated." She was "constantly pacing, waving her arms in the air, and raising her voice."

Mother attributed her deteriorated mental state and relapse on drugs to her grief over her partner's recent death. She said that before Antonio T. died, she had not been using methamphetamine. She also dismissed her somewhat manic behavior as just a personality trait. The children were ordered detained by the court on September 12, 2019.

## B. *The Petition and Jurisdiction*

The petition alleged failure to protect the children under Welfare and Institutions Code[2] section 300, subdivision (b)(1), citing as a bullet point that "[t]he children sleep in the middle part of the residence that is not connected to the trailers and with no adult supervision in case of a fire. [J.L.] sleeps in a crib and [Katie T.] sleeps in a playpen. The children would be unable to get out in an emergency." As a separate allegation under section 300, subdivision (b)(1), the petition alleged the children were at risk due to "the

---

home. She said she no longer wanted her children and did not care what happened to them. She kept the children in a dog kennel when they were outdoors and allowed them to drink water from the dogs' water bucket. She was arrested for felony child endangerment and jailed. The dependency petition primarily alleged as grounds for asserting jurisdiction over the children Mother's "significant mental health issues," alcohol abuse, failure to provide her three sons with a safe environment, and her incarceration, which left her children temporarily without provision. (§ 300, subds. (b), (c) & (g).)

[2] Undesignated statutory references are to the Welfare and Institutions Code.

4

inability of the mother to provide regular care for the children due to the mother's substance abuse and mental illness." There were several bullet points under each of the foregoing statutory allegations, illustrating the nature of the problem. For the children with living but absent fathers, there were allegations based on the fathers' failure to protect the children from Mother and leaving their children without provision. (§ 300, subds. (b)(1), (g).)

On November 27, 2019, after hearing evidence and argument, the court sustained the allegations of the petition, with the exception of one bullet point. The petition had alleged that Mother drove J.L. and Katie T. in the car while under the influence of methamphetamine, and the court found the allegation was unsubstantiated. The court assumed jurisdiction over the children.

## C. *Katie T.'s Placement and Her Visitation with Her Family*

### 1. The placement with May E., Katie T.'s paternal aunt

Both Antonio T. and Katie T. were enrolled members of the Round Valley Indian Tribes (Tribe). Antonio T. was also the presumed father of J.L., Katie T.'s three-year-old sister, but biological parentage had not been established, and she was not eligible for membership in the Tribe. As soon as the children were detained, Katie T. was placed in a foster home in San Diego at the Tribe's request,[3] and J.L., with whom she was especially closely

---

[3] The Tribe had consulted with Katie T.'s paternal grandmother, a Tribe member, in selecting May E.'s home for placement of Katie T. When it recommended the placement in San Diego, the Tribe assumed Mother would be bypassed for services because of her earlier dependency cases. It may be inferred that reasonable proximity may not have been top-of-mind. (See 25 U.S.C. § 1915(a) [reasonable proximity not required for adoptive placements].) The court at disposition nevertheless ordered reunification

bonded, was placed with her. Their foster mother was Katie T.'s aunt May E., the paternal half-sister of Antonio T.

After the children were detained, their maternal aunt, Kate K., cleaned up her house and made necessary repairs. She got rid of the possum and the crow. Kate K.'s home was once again approved as a foster home by the Resource Family Approval Program and she was approved as a foster parent. In late September or early October 2019, J.L. was returned to Kate K.'s house. On November 1, 2019, the three older boys (ages 6, 8 and 9) were also returned to the same house from which they had been detained, with Kate K. as their foster mother. The Tribe objected to returning Katie T. to that house or to Kate K., and Katie T. remained in San Diego.

On November 26, 2019, Mother's counsel asked the court to change Katie T.'s placement to maternal aunt Kate K. At that time, the children's attorney agreed with Mother's attorney that Katie T. should be moved closer to Mother to facilitate reunification. The Agency took no position. The Tribe opposed changing Katie T.'s placement. After hearing further argument the next day, the court refused to change Katie T.'s placement.

May E. is an educational training consultant for a software company, designing training programs for adults. She works from home but occasionally travels out of the area for work. May E.'s husband and their three-year-old daughter also live in the home. Her husband is an artist who creates paintings and crafts invoking Native themes. He also works from home, but they stagger their work hours so they can give Katie T. a lot of one-on-one attention. May E. was also studying childhood development in a series of courses in community college at the time of the disposition hearing.

---

services for Mother, finding it in the children's best interests. The social worker testified no bypass provision applied to Mother.

6

May E. described her motivation to care for Katie T. as arising from a desire to help children in need, together with the deep love she feels for her deceased brother and now for Katie T. She and Katie T. had met only once before Antonio T. died, when Mother and Antonio T. brought the children to visit May E. on Father's Day in 2019. Nevertheless, she and her husband have expressed their desire to adopt Katie T. if reunification fails.

The Tribe-approved placement is some 700 miles and a 12-hour drive one-way from Mother, Katie T.'s siblings, both of her grandmothers, her aunt Kate K. (by whom she primarily had been raised), and even her Tribe's reservation. In October 2019, a different judge—Judge Ann C. Moorman, who would preside over the jurisdiction and disposition hearings—acknowledged the San Diego placement was "not ideal" due to the distance and ordered the Agency to work with the Tribe to try to find a placement closer to Mendocino County. She predicted the likelihood of her "ever placing" Katie T. in San Diego County was "remote." The Agency and the Tribe made efforts to find an alternative placement with no success.

At the end of the jurisdiction hearing on November 27, 2019, when Mother's counsel requested a change of placement for Katie T., Judge Moorman asked for "more specifics" on Katie T.'s therapeutic needs. She denied the placement change request because she feared it might be necessary to make another placement change at disposition. She found an immediate change was not in Katie T.'s best interests. And, as we shall discuss, by the time the disposition orders were issued, the judge had changed her mind about the distant placement and again ordered Katie T. placed with May E.

### 2. Other relatives in San Diego

Katie T. also had a half-sister named Kaylee T. (age 12), Antonio T.'s oldest child, who lived in San Diego, and they saw each other frequently after

7

Katie T. was placed with May E. Katie T. had been bonding with Kaylee. May E. and her husband had a three-year-old daughter, Evelette, living in the foster home, with whom Katie T. was becoming bonded. First cousins are very important in Native American culture, treated almost like siblings. Katie T. and Evelette are only five months apart in age, and they shared a bedroom in May E.'s home. Katie T. also has additional paternal aunts and uncles in the San Diego area. We infer these are not Native American relatives.

### 3. May E.'s attitude toward facilitating reunification

Mother complained early on that Katie T. was being isolated and turned against her. She wanted Katie T. moved back to Mendocino County, and specifically to Kate K.'s house. Mother portrays May E. as resistant to reunification efforts. Although the social worker made one such comment, we see little other evidence to support that portrayal.

May E. helped Kaylee T. to reunify with her family, taking care of her as a foster child for about a year when she was a baby. May E. expressed satisfaction with having helped, and she still has a very close relationship with Kaylee. May E. affirmed under oath her willingness to facilitate reunification between Katie T. and Mother, including overnight visits if the Agency were to approve.

### 4. The Native American influence in May E.'s home

Although May E. is not a member of any Native American tribe, she feels a connection to Native American culture from having grown up with Antonio T. and having two nieces enrolled in the Tribe. In addition, she studied Native American culture in college and worked with the Tribe as part of that study. She grew up in the Round Valley area until age 14 and even lived on the Tribe's reservation for a time. She has twice taken Katie T. to visit her paternal grandmother, a member of the Tribe, whom May E. has

8

known since she was 10 years old, and with whom she has a close relationship. That grandmother lives in Round Valley. May E. and her husband had taken Katie T. to Round Valley's Indian Days in late September 2019 and visited the grandmother at that time.

Also, May E.'s husband is Quechua, an indigenous tribe from Peru. He knows how to play a Native American flute traditional to his tribal culture. He is teaching Katie T. to play the flute and Pow Wow drums, and she is learning Native American dancing. Even before Katie T. was placed with them, he and May E. attended indigenous gatherings in pursuit of his musical and cultural interests. He performs as a dancer in some of the ceremonies. In addition, after Katie T. was placed with them, they began attending her Tribe's Pow Wows and other gatherings so Katie T. would become familiar with her Tribe's customs, culture, and ceremonies.

### 5. Katie T.'s visitation with Mother and her family

May E. brought Katie T. to Mendocino County for all court hearings and facilitated face-to-face visitation with Mother and Katie T.'s siblings during those times, including back-to-back visits on consecutive days. As of January 28, 2020, May E. testified that she and her husband had brought Katie T. to Mendocino County for five visits with her family since Katie T. was placed with them on September 9, 2019, and they had met Mother midway between for at least one, maybe two, additional visits. May E. committed to continuing to bring Katie T. to Mendocino County once a month and to meeting Mother midway once or twice a month.

Mother points out that May E. only brought Katie T. to Mendocino County for visits corresponding to court dates. Although that is true to some extent, May E. also brought Katie T. up to Indian Days in late September, and Katie T. visited with Mother and her siblings then, when no court dates were scheduled. With reasonable notice, May E. also testified that she and

9

her family would be willing to relocate to Sonoma County or Mendocino County to facilitate visitation.

May E.'s husband also supervised daily video chats or phone calls between Katie T. and Mother. Katie T. also had weekly video chats with her siblings. Mother complained about the quality of the chats, but she did not deny they happened almost daily. Mother complained that Katie T. was sometimes napping when the calls were supposed to occur or was eating or otherwise distracted. She said the calls generally lasted anywhere from 20 seconds to three to five minutes; the longest one being 14 minutes. May E. and her husband sent a spreadsheet every couple of months to the social worker to let her know how calls were going.

Since detention, Katie T. had visited with her siblings in person five times. Mother described in positive terms the sibling visits and Katie T.'s visit with her maternal grandmother. Kate K. had also been included during one visit.

To further facilitate visitation, the Agency offered to buy airline tickets for Mother to travel to San Diego for visits with Katie T. every other week. The Agency filed an unopposed request for judicial notice, which we hereby grant (Evid. Code, §§ 452, subd. (h), 459; Ct. App., First Dist., Local Rules, rule 6, Requests for judicial notice), showing direct flights from the Sonoma County Airport in Santa Rosa to the San Diego International Airport, and such flights take slightly more than 90 minutes to just under one hour and 45 minutes. We also take judicial notice that the Santa Rosa airport is roughly a two-hour-and-15-minute drive from Covelo, where Mother and the other four children live. The record reflects that Mother flew to San Diego, presumably at Agency expense, on December 27, 2019, for a visit with Katie T., apparently hosted at May E.'s home. It is not clear whether Mother

10

ever again availed herself of these offers.  It is also not clear to what extent the pandemic may have affected these plans.

## D. *The Contested Disposition Hearing*

On January 10, 2020, Mother filed a written motion to have Katie T. placed with Kate K.  The evidentiary portion of the contested disposition was held on January 15, 2020, January 28, 2020, and February 26, 2020.  Argument was heard on March 12, 2020, but the disposition orders were not signed until April 28, 2020, nearly eight months after detention.

### 1. The ICWA expert's testimony

The Agency called as its first witness Richard England, the designated ICWA expert for Katie T.'s Tribe.  (§ 224.6, subd. (a).)  England expressed concern about Mother's ability to parent Katie T., including her initial and ongoing inconsistency in acknowledging her substance abuse, her significant child welfare referral and dependency history, her use of methamphetamine, and her denial that the children were in a situation at detention that was detrimental to their well-being.  England also was aware of and concerned about Mother's history of inconsistent use of her prescribed psychotropic medications.

England opined that if Katie T. were returned to Mother at that time, it would likely result in serious physical harm or emotional damage.  (See 25 U.S.C. § 1912(e); § 361.7, subd. (c).)  Mother's participation in reunification services did not change England's opinion because a long-term history of substance abuse is hard to break, and Mother had been diagnosed with borderline personality disorder, which is very difficult to treat.

England testified it was important for Tribe members Katie T.'s age to attend the Tribe's Indian Days in the summertime, where there are lots of activities for children.  It was also important for Katie T. to spend time with

blood-related family, ideally in a setting in which Native American culture and values would be reinforced consistently and daily.

England testified that Katie T.'s current placement provides her with just such cultural reinforcement. Katie T.'s placement with her paternal aunt was an "ICWA-preferred placement," the preference of Katie T.'s Tribe, and a "very positive" placement where she lives in close proximity to her half-sister who is also a member of the Tribe. England further noted the paternal aunt's husband, a member of an indigenous tribe himself, had a strong Native American influence on the household. Katie T. was getting exceptional care, developing a bond with her sibling on her father's side, and developing new bonds and attachments with Native American extended family members.

England had serious concerns about placing Katie T. with Kate K. based on a "fire-starting" incident[4] and a concern about overwhelming her with too many children, which could potentially "blow up [the] placement." England opined it would be detrimental to move Katie T. from her "ICWA-preferred placement." England also prepared a report received in evidence.

### 2. The paternal aunt's testimony

The Tribe called May E. as a witness. Her testimony was summarized in part I.C., *ante*. She also submitted a letter to the social worker, which was attached to the disposition report and received in evidence.

---

[4] On New Year's Eve, Kate K. was injured while burning their Christmas tree outside the house using gasoline. She was burned badly enough that she had to be airlifted to U.C. Davis hospital near Sacramento. She left the five children in the care of their grandmother, Susan K., and friends while she was hospitalized for two days. Kate K. did not report the incident to the Agency.

### 3. Mother's testimony

Mother testified she had tested clean of methamphetamine for four months. She admitted using marijuana at least once a day for pain and recreation. She claimed she had used methamphetamine only three times since having children, meaning in nine years. She attended a substance abuse class through Yuki Trails and described her work in various drug programs and other groups, including therapy once a week and completing the "Motherhood is Sacred" program. She had been active in a positive parenting peer support group for four months. Mother testified she was current on her psychotropic medications. All three of the boys were in therapy. She hoped to get her children into family therapy through the Tapestry counseling program or a grief support group for families. Mother claimed to have a group of at least 10 clean and sober friends she could rely on as a safe support network. Mother's testimony about her participation in programs was supported by the testimony of the manager of Healing Hearts, a crisis response center in Covelo that offered the peer parenting group and planned to start a psychologist-led grief processing group.

Mother discussed housing and said she hoped to be able to rent a three-bedroom house when the owner got out of the hospital. She was then living "at the airport" in a "communal residence." She also said she owned a recreational vehicle that sleeps six to seven people, she had a place to park it, and she wanted all of her children returned to her to live in the trailer. Mother primarily hoped to be allowed to return to live in Kate K.'s home, but Kate K. was opposed to that idea. The court ultimately found Mother's housing plan for the children was unstable. The court also found the house trailer was not a "safe and stable location" for the children "or any component of the children."

### 4. The maternal aunt's testimony

Kate K., called by Mother, testified that her house had been cleaned up and the four children currently placed with her were safely housed, they all had their own beds, and they were living with a structured routine. Kate K. testified it would not be a hardship for her if Katie T. were returned to her care, but the judge thought her testimony on that point "wavered."

Kate K. was allowed by the Agency to supervise visits between Mother and the four children in her care. She required Mother to be "clean" of drugs during visitation and preferred that she be up-to-date on her mental health medications. She testified, however, that she had a hard time telling whether Mother was under the influence or was off her medications. The judge commented at disposition that in this regard Kate K. lacked insight, and it was concerning. Kate K. also felt that the conditions in her house before the children were detained were "appropriate." The Agency, though, expressed concern that an approved foster parent would let her home decline to the point that it did, and as a mandated reporter, that Kate K. did not report Mother's neglect of the children.

### 5. The social worker's testimony

The social worker's disposition report discussed the pros and cons of the two relative placements under the factors identified in section 361.3. The report concluded that Katie T. should not be moved from her San Diego placement.

Called to testify by the Tribe, the social worker expressed concerns about returning Katie T. to Mother. She explained that the Tribe had chosen May E. as a foster mother because the paternal grandmother had recommended her. (See fn. 3, *ante*.) She acknowledged that all the children expressed some relief when they were in stranger foster care because they were fed and cared for and had clean clothes. She agreed that Katie T. likely

14

suffered emotional trauma from her several moves in foster care and because she was grieving the death of her father.

### 6. The Tribe's social worker's testimony

Mother's counsel called the Tribe's social worker to testify that she had been to the property where Mother planned to park her trailer. The court then asked her whether it was safe to place the children there, and she responded that the Tribe would not approve.

### 7. The parties' positions

The case was argued on March 12, 2020. The Agency supported removing the children from Mother and joined with the Tribe in supporting Katie T.'s placement with May E. The children's attorney supported the removal of all the children but questioned the placement of Katie T. in May E.'s home. She believed Mother was likely to reunify with her other children, and she believed Katie T. should be placed closer to home to promote reunification. Mother's attorney argued for termination of jurisdiction and return of the children to Mother, or alternatively, for conversion of the proceeding into a family maintenance case. She argued that Katie T.'s placement was not within reasonable proximity to the family home as required by ICWA and urged that Katie T. be moved to Kate K.'s house with her siblings. The Tribe argued that Mother was not ready to resume custody of the children. The Tribe strongly urged that Katie T. be left in May E.'s care.

### E. *Disposition Findings and Orders*

The disposition orders for all the children were signed on April 28, 2020, and filed on May 6, 2020. The court declared all five to be dependent children and ordered them all removed from Mother's care. It found by clear and convincing evidence there was a "a substantial danger to the physical health, safety, protection or physical or emotional well-being" of the children

if they were returned home, and that "there are no reasonable alternative means" by which the children's "physical health can be protected without removing" them from Mother's physical custody. (§ 361, subd. (c)(1).)

Katie T. was ordered placed with May E. The court found ICWA applied to Katie T. but not to the other children. The judge found by clear and convincing evidence that active efforts had been made to prevent the breakup of Katie T.'s family. She did not make an express finding of reasonable proximity but concluded that the Agency, in consultation with the Tribe, had adhered to ICWA in its placement of Katie T.

At the hearing on May 7, 2020, the judge recited her reasons for the placement, referring to the factors listed in section 361.3, subdivision (a), which are considered when deciding between two or more relative placements (*id*., subd. (b)). Judge Moorman found May E.'s testimony particularly helpful in reaching her decision. The court said the long distance to May E.'s home was "the only factor" weighing against Katie T.'s placement with her. Removing Katie T. from May E.'s home, the court found, would be "quite harmful" to her, given the attachments she had developed with May E. and her family. The judge considered the Tribe's placement choice, as well as the degree to which the placement with May E. promoted Katie T.'s connection to her Tribe, in deciding to leave Katie T. in May E.'s care at disposition.

Supervised visitation between Katie T. and Mother was ordered at a minimum of eight hours a month face-to-face, plus daily video chats, and the Agency was authorized to permit overnight visits. The court ordered Mother to be responsible for travel to visits. Supervised visitation between Katie T. and her siblings was ordered at least once a month, plus weekly video chats.

The four oldest children were ordered to remain in out-of-home care with Kate K. Supervised visitation was ordered for Mother for a minimum of

two hours per week, with the Agency having discretion to increase visitation and to authorize overnight visits.

### F. *The Notices of Appeal*

The case involves two related appeals that have been consolidated for all purposes in this court. The first notice of appeal by Mother (A159220) was filed December 24, 2019, and appealed from the November 27, 2019 placement decision for Katie T. only. That was not an appealable order (§ 395), and the appeal shall be dismissed. The second notice of appeal (A160139) was filed by Mother on May 6, 2020, challenging the disposition orders and seeking return of all five children. In response to Mother's unopposed motion, we construe that notice of appeal as encompassing the court's previous orders on November 27, 2019, and those signed on April 28, 2020, and filed May 6, 2020, and we will review any findings supporting those orders made orally on May 7, 2020. (Cal. Rules of Court, rule 8.100(a)(2).)

## II. DISCUSSION

### A. *Mother's Contentions*

Mother contends Katie T.'s placement in San Diego is not reasonably proximate to Katie T.'s pre-detention home, as required by ICWA. (25 U.S.C. § 1915(b).) Mother insists Katie T. has no "special needs" that would justify such a distant placement. (*Ibid*.) Mother further contends there is no substantial evidence to support the court's removal orders for any of the five children. Finally, Mother urges, if we reverse the orders for any of the children, but not all, we should reverse all the children's orders and remand the case for the judge to decide again, with all available information, the best disposition for them, citing *In re Carmaleta B.* (1978) 21 Cal.3d 482, 496.

17

**B.** *Katie T.'s Placement with May E. Does Not Violate ICWA*

    **1. Standards of review**

Matters of statutory construction are reviewed de novo (*In re Anthony T.* (2012) 208 Cal.App.4th 1019, 1028 (*Anthony T.*), so to the extent we are called upon to determine the meaning of "reasonable proximity" or "special needs" under ICWA or other matters of statutory construction, we exercise independent judgment.  A factual determination or implied finding that a placement is reasonably proximate to the Indian child's home under ICWA, considering any special needs, is reviewed for substantial evidence. (*Anthony T.,* at p. 1031.)  The court's finding of Katie T.'s "special emotional needs" is factual and subject to substantial evidence review.  (Cf. *In re A.A.* (2008) 167 Cal.App.4th 1292, 1326 [substantial evidence standard applies to "good cause" finding].)

    **2. "Reasonable proximity" to the Indian child's home**

       a. *The requirement of "reasonable proximity"*

ICWA sets tiered preferences for foster care placement as follows:  "Any child accepted for foster care or preadoptive placement shall be placed in the least restrictive setting which most approximates a family and in which his special needs, if any, may be met.  *The child shall also be placed within reasonable proximity to his or her home, taking into account any special needs of the child.*  In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with— (i) a member of the Indian child's extended family; (ii) a foster home licensed, approved, or specified by the Indian child's tribe; (iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or (iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs."  (25 U.S.C. § 1915(b), italics added.)  California's placement-

preference statute for Native American children parallels section 1915 of title 25 of the United States Code (*In re A.A.*, *supra*, 167 Cal.App.4th at p. 1327) and contains a provision cognate to the italicized sentence just quoted. (§ 361.31, subd. (b).)

"Reasonable proximity" is not further defined in ICWA (see 25 U.S.C § 1903), but compliance with the "reasonable proximity" requirement is mandatory. (*Anthony T.*, *supra*, 208 Cal.App.4th at pp. 1029–1030.) Significantly, ICWA requires that we assess reasonableness of the proximity of the placement "taking into account any special needs of the child." (25 U.S.C. § 1915(b).) We liberally construe ICWA and the cognate California statutes in favor of the Indian tribe. (*Bryan v. Itasca Cty., Minnesota* (1976) 426 U.S. 373, 392; *Anthony T.*, *supra*, 208 Cal.App.4th at p. 1030, fn. 6.)

> b. *Geographic distance and driving time do not alone determine "reasonable proximity"*

Both parties rely chiefly on *Anthony T.*, *supra*, 208 Cal.App.4th 1019, the leading California case on the meaning of "reasonable proximity" under ICWA. In accord with *Anthony T.*, we hold "reasonable proximity" is a flexible concept that must take into account different available travel modes between the child's home and the proposed foster home, as well as the child's "special needs," if any, as is statutorily required, and considering all of "the child's needs and his or her family's circumstances," with the child's best interests being the "guiding principle." (*Anthony T.*, *supra*, 208 Cal.App.4th at p. 1030.) The court may also consider adaptations of the concept of face-to-face visitation, such as the video chats used in this case, when ruling on whether the proposed placement creates a "geographical barrier to visitation," making it "presumptively not within reasonable proximity" of Katie T.'s home. (*Id.* at p. 1031.)

19

In *Anthony T.*, a dependent Indian child and his non-Indian mother both appealed from a disposition order placing Anthony with a Native American family of his tribe's choice, located a two-and-a-half-hour drive from his mother's home. (*Anthony T., supra*, 208 Cal.App.4th at pp. 1023–1024, 1031.) The Fourth District, Division One, held the placement was not "within reasonable proximity" of the child's home within the meaning of section 1915(b) of title 25 of the United States Code. (*Anthony T.*, at p. 1031.)

But significantly, *Anthony T.* emphasized that "reasonable proximity" is "determined on a case-by-case basis considering the child's needs and his or her family's circumstances. It is not simply a matter of determining distance, mileage or travel time. The guiding principle is the child's best interests. (§ 300.2.)" (*Anthony T., supra*, 208 Cal.App.4th at p. 1030.) And while it reversed the trial court's placement order, the Court of Appeal did not "direct[] the court to remove Anthony from the [tribally approved distant placement] without assessing 'the family's current circumstances and any developments in the dependency proceedings that may have occurred during the pendency of the appeal.'" (*Id.* at p. 1034.)

In applying the holding of *Anthony T.* to the facts of this case, we note preliminarily that Anthony, as well as his mother, appealed the trial court's placement order, whereas Katie T. has not appealed the court orders placing her with May E. (Cf. *Anthony T., supra*, 208 Cal.App.4th at pp. 1023–1024.) We also note that the placement in *Anthony T.* was with a " 'tribally approved' " Indian family, not with an extended family member. (*Id.* at p. 1024; see 25 U.S.C. § 1915(b)(ii); § 361.31, subd. (b)(2).) Unless his tribe had altered the statutory priorities by resolution (see 25 U.S.C. § 1915(c); § 361.31, subd. (c); *In re A.F.* (2007) 18 Cal.App.5th 833, 845), we may infer

that no placement with an extended family member was available.[5] (25 U.S.C. § 1915(b)(i); § 361.31, subd. (b)(1).) Here, by contrast, two extended family members are vying for placement. In such circumstances, as we shall discuss in part II.C.1., *post*, section 361.3 comes into play.

### c. *The implied finding of reasonable proximity was supported by substantial evidence*

*Anthony T.* and the requirement of reasonable proximity had been fully argued to Judge Moorman more than once before she made her placement decision. In ordering Katie T. to remain with May E. at disposition, the court expressly found the Agency had adhered to ICWA in placing Katie T. It therefore impliedly found the placement in San Diego was reasonably proximate to Kate K.'s home.

As *Anthony T.* held, we must consider factors other than distance and nominal driving time when reviewing a reasonable proximity determination. (*Anthony T.*, *supra*, 208 Cal.App.4th at p. 1030.) The court in *Anthony T.* also considered the child's infancy and intolerance for the long trip in deciding that the placement was not reasonably proximate to Anthony's home. (*Id.* at p. 1032.) In addition, the court noted that the child's mother could not legally drive, and hence could not make the trip instead of Anthony. (*Id.* at p. 1029 & fn. 7.) There was also no convenient midway point where visitation could take place. (*Id.* at p. 1032, fn. 8.) In other words, the court considered a constellation of facts relevant to the feasibility of travel between the two points for purposes of visitation.

---

[5] "[E]xtended family member" is, when possible, "defined by the law or custom of the Indian child's tribe . . . ." (25 U.S.C. § 1903(2).) In California, the tribe's prevailing social and cultural standards may be proved by the testimony of an expert witness. (§ 361.31, subd. (f).) England's testimony did not specifically address how the Tribe defines that term.

21

It is largely the current placement's impediment to visitation that Mother finds objectionable. At least if the goal for the Indian child is family reunification, reasonable proximity must be determined in large part based on the degree to which the proposed placement interferes with reasonable visitation. For a young child especially, and early in the dependency, "[w]hen the primary goal of the dependency proceedings is family reunification, the location of an Indian child's placement must reasonably support that goal, including frequent visitation between parent and child. (42 U.S.C. §§ 621, 629; §§ 300.2, 362.1, subd. (a)(1)(A), 361.5, subd. (a).)" (*Anthony T.*, *supra*, 208 Cal.App.4th at p. 1030.)

Visitation is "an essential component of a reunification plan." (*In re Mark L.* (2001) 94 Cal.App.4th 573, 580–581, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) The juvenile court is authorized to order visitation even if the parent is otherwise ineligible for reunification services. (§ 361.5, subd. (f).) Even incarcerated parents are entitled to visitation services with their children in appropriate circumstances. (*Id.*, subd. (e)(1)(C).) For parents who are not disqualified from visiting with their children, "[v]isitation shall be as frequent as possible, consistent with the well-being of the child." (§ 362.1, subd. (a)(1)(A).) Here, we find accommodation can be made and has been made to afford Mother and Katie T. reasonable visitation despite the distance. (Cf. Fam. Code, § 3100, subd. (a) [parents entitled to "reasonable visitation"].)

As Mother acknowledges, proximity may be measured in distance or in time. Thus, a reasonable proximity finding must take account of different feasible modes of transportation between the child's family home and the proposed foster home. *Anthony T.* noted there were no "reasonable alternatives to transporting Anthony" by car for two and a half hours each

way.  *Anthony T.* therefore supports the view that travel time by other available means should be considered in assessing reasonable proximity. (*Anthony T.*, *supra*, 208 Cal.App.4th at p. 1032.)  Here, the reasonable alternative of travel by air is much more efficient, cutting the one-way travel time from 12 hours to 4 hours.  Because the Agency offered free airline tickets to Mother for the purpose of visitation, we see no reason why that should not factor into our review.

As *Anthony T.* also illustrates, which party does the traveling is an important consideration.  (*Anthony T.*, *supra*, 208 Cal.App.4th at p. 1029, fn. 7.)  In *Anthony T.*, a newborn baby was being transported on the long drive for visitation and the trip was taking its toll on the infant.  (*Id.* at pp. 1024–1025, 1031.)  Here, we compute that Mother could travel to visit Katie T. in San Diego once every two weeks at Agency expense, spending roughly four hours traveling each way.  Were we to ignore this fact, we would overstate the hurdles to visitation that make a distant placement undesirable, and thus we would skew the evidence against the court's implied finding of reasonable proximity.

In addition, though they are not substitutes for in-person visits, current modes of communication, such as video chat, can help to maintain parent-child bonds and to promote reunification even if face-to-face visits must be less frequent than the parent would like.  Mother complains that Katie T. was too young to use the devices properly, Katie T. would sometimes be napping when the call was scheduled, or no one would answer the phone. Still, Mother agreed the electronic communication happened almost daily.  Of course, a video chat cannot replace a mother's hug or kiss, but where, as here, the foster family is willing to facilitate *daily* video or phone chats, these calls

do have value and must be considered in assessing the adequacy of visitation, which in turn largely dictates the reasonable proximity decision.

Finally, we consider as a factor tending to shrink the distance between the two homes May E.'s extraordinary willingness to facilitate visitation, which was mentioned by the court in its explanation of its placement decision. (See § 361.3, subd. (a) [statutory factors are not exclusive].) Even in non-ICWA cases, relative placements receive preferential consideration "because relative caregivers are more likely to favor the goal of reunification and less likely than nonrelative caregivers to compete with the parents for permanent placement of the child." (*In re Joseph T.* (2008) 163 Cal.App.4th 787, 797.) May E. exemplifies the point.

May E. testified that she and her family were willing to continue driving to Mendocino County once a month for visitation and would meet Mother halfway another time or two per month. May E. and her husband would continue to facilitate visitation if the Agency allowed Mother to have overnight visits. At least in theory, Mother could have two additional visits each month by flying to San Diego at Agency expense. Thus, she could conceivably see Katie T. four or five times a month face-to-face, plus daily video or telephone chats. The court could reasonably find such a visitation schedule to be "as frequent as possible," consistent with the well-being of the child. (§ 362.1, subd. (a)(1)(A).) Such openness to assisting in visitation provided more evidence for the reasonable proximity decision. With 120 days' notice, May E. was even willing to move her family closer to Mendocino County if the court required it.

The foregoing factors, considered together and in light of Katie T.'s special needs, constituted substantial evidence supporting the dependency court's implied finding that Kate K.'s home and May E.'s home were

24

reasonably proximate.[6]  Therefore, the placement decision did not violate ICWA, especially when Katie T.'s special needs are considered.

### 3.  Katie T.'s "special needs"

#### a.  *"Special needs" need not be "extraordinary"*

One consideration in the reasonable proximity determination is statutorily mandated:  the "special needs" of the Indian child.  (25 U.S.C. § 1915(b).)  "Special needs" is not defined in ICWA.  (25 U.S.C. § 1903.) Mother argues we should adopt a meaning consistent with a similar phrase found in the Code of Federal Regulations for use in determining whether there is "good cause" for variance from the statutory placement preferences. (25 U.S.C. § 1915(b) [placement preferences are mandatory "in the absence of good cause to the contrary"].)  The term "special needs" is not used in the statute in relation to "good cause" or in 25 Code of Federal Regulations part 23.132(c)(4) as an example of what might constitute good cause.  There, "extraordinary physical, mental, or emotional needs of the Indian child" may justify a variance from the statutory placement preferences, "such as specialized treatment services that may be unavailable in the community where families who meet the placement preferences live."  (25 C.F.R

---

[6] Mother also cites *In re Luke L.* (1996) 44 Cal.App.4th 670, a non-ICWA case in which two of a mother's children were placed in Southern California "hundreds of miles" from the mother's home.  (*Id.* at pp. 676, 681.) In determining whether the placement was too distant, the court discussed transportation options.  (*Id.* at p. 681.)  The agency's solution—buying the mother bus tickets to visit her children and covering her meals and lodging (*id.* at p. 676)—would have kept her on the bus for "many long hours in transit."  (*Id.* at p. 681.)  Because it would "effectively doom visitation" between the mother and her children, the court reversed the placement order. (*Id.* at pp. 681–682.)  The proximity here was much closer—measured by travel time—being just four hours one way for Mother on an airline ticket purchased by the Agency.  We do not agree that visitation was "doom[ed]" in this case, especially considering the daily video and phone chats.

§ 23.132(c)(4) (2020); see Cal. Rules of Court, rule 5.485(b)(3)(D).) Mother argues the term "special needs" in section 1915(b) of title 25 of the United States Code should import from 25 Code of Federal Regulations part 23.132(c)(4) an added requirement that the child's special needs must be "extraordinary," even to be considered in the "reasonable proximity" determination (25 U.S.C. § 1915(b); 25 C.F.R. § 23.131(a)(3)).

We reject that notion based on fundamental principles of statutory construction. Part 23.132(c)(4) of 25 Code of Federal Regulations does not purport to define "special needs" at all, and therefore cannot control the definition of that term in the statute. Moreover, under ICWA, we find good reason to impose a less demanding requirement of showing "special needs" when the court is deciding on a placement within a given statutorily prescribed tier (25 C.F.R. § 23.131(a)(2)), and a more demanding standard when deciding on "good cause" to deviate from the statutory preferences. The difference in language appears to have been intentional. An Indian child's "special needs" must be taken into account in determining whether a placement is in the "least restrictive setting which most approximates a family" and is in "reasonable proximity" to the child's home (25 U.S.C. § 1915(b)); but "extraordinary" needs must be shown to allow deviation from the statutorily established tiers (25 C.F.R. § 23.132(c)(4)). "Good cause" should be found sparingly, for the tribe's interests presumably are protected by the statutorily defined tiers. The phrase "special needs" in section 1915(b) of title 25 of the United States Code warrants a broader, more inclusive understanding than the intentionally narrower provision of 25 Code of Federal Regulations part 23.132(c)(4).

b. *Katie T.'s "special emotional needs"*

We do agree with Mother that "special needs" may be "physical, mental, or emotional" (25 C.F.R. § 23.132(c)(4)), and hold special emotional needs may include the Indian child's need to recover from trauma. The dependency court found Katie T. suffered from "special emotional needs" due to her unstable history in foster care for virtually "all of her life." The court also found May E. was providing for Katie T.'s "therapeutic" needs, among others.

The death of Katie T.'s father when she was two years old further supports the dependency court's finding of her "special emotional needs." When first placed with May E., Katie T. told people her father had been murdered.[7] Later, Katie T. began telling others that her father died in a fire. Either version of her father's death suggests it had a sudden and violent impact on her. She was no doubt traumatized by his death; that she had "special emotional needs" was a fact-finding supported by substantial evidence.

In the disposition report, the Agency recommended a therapeutic preschool for Katie T. May E. testified that Katie T. was "shut down emotionally" when she was first placed in May E.'s care. She rarely smiled and did not express herself freely. She had difficulty sharing, was food insecure, and had trouble sleeping. Her behavior was improving at May E.'s house, shown in better sleep habits, eating habits, sharing with others, and taking turns.

The Agency's research showed a therapeutic daycare, such as existed in few areas of the state, and therapeutic preschool were available in San Diego

---

[7] The older children also believed Antonio T. was murdered. The oldest boy had nightmares about it almost nightly and worried that he might be murdered by the same people. The three boys were all in therapy, but Katie T. was too young for play therapy.

to serve Katie T.'s special emotional and psychological needs. The Tribe requested and strongly endorsed therapeutic daycare for Katie T. There were no such programs near Covelo.

Mother does not appear to disagree that, even when proximity is statutorily required, special needs may make a distant placement reasonable (*In re Nicole H.* (2016) 244 Cal.App.4th 1150, 1156), but she denies that Katie T. has any special needs, citing her normal growth and development, normal social skills, and absence of any identified mental health concerns requiring a referral. None of this speaks to Katie T.'s emotional needs resulting from trauma. On that point, the court's finding of "special emotional needs" was well-supported.

It turned out that Katie T. was not eligible for therapeutic daycare or preschool until age three, so she was not currently enrolled at disposition. May E. had a space reserved for her beginning in June 2020. Whether Katie T. was ever able to attend that preschool is uncertain due to the impact of the COVID-19 pandemic and the associated lockdowns. Regardless, the dependency court did not err by considering the availability of such services in determining reasonable proximity. Substantial evidence supported its conclusion.

## C. *Katie T.'s Placement with May E. Was Not an Abuse of Discretion*

### 1. Choosing between two ICWA-preferred foster homes

Ordinarily, in a case involving competing relative requests for placement, the court makes its placement decision using the factors identified in section 361.3.[8] As that section itself provides, however, the listed factors

---

[8] The statutes also allow the court, in deciding an Indian child's placement or a relative placement, to consider the wishes of the parent. (§§ 361.3, subd. (a)(2), 361.31, subd. (e).) The court here did take note of Mother's opposition to the placement.

are not exclusive. The Tribe's placement request and the degree to which May E. could reinforce Katie T.'s Native American identity were valid considerations—indeed, crucial considerations under ICWA—that were properly taken into account by the court below and should routinely be factored into every decision placing an Indian child.[9] (See *In re A.F.*, *supra*, 18 Cal.App.5th at p. 845 [tribe's placement choice "was a factor for the court's consideration"]; *In re Alexandria P.* (2016) 1 Cal.App.5th 331, 335, 351 [court properly considered "the capacity of her extended family to maintain and develop her sense of self-identity, including her cultural identity and connection to the Choctaw tribal culture"].)

## 2. The standards of review

In a non-ICWA case, a placement decision in a dependency proceeding is "committed to the sound discretion of the juvenile court, and the trial court's ruling should not be disturbed on appeal unless an abuse of discretion is clearly established." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318; *In re A.S.* (2012) 205 Cal.App.4th 1332, 1340; *Alicia B. v. Superior Court* (2004) 116 Cal.App.4th 856, 863.) The reviewing court should interfere only " ' " 'if we find that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that [s]he did.' " ' " (*Alicia B. v. Superior Court*, *supra*, 116 Cal.App.4th at p. 863.)

---

[9] ICWA expert England testified the placement in San Diego was the "ICWA-preferred" placement, as well as the Tribe-preferred placement. We disagree. Neither home is "ICWA-preferred" over the other. (*In re A.F.*, *supra*, 18 Cal.App.5th at p. 843.) They are both "ICWA-preferred" over other potential foster homes because they are in the first preference tier. (25 U.S.C. § 1915(b)(i); § 361.31, subd. (b)(1).) The judge treated both homes equally and chose between them using factors specified in section 361.3 for relative placements.

"[I]n the case of an Indian child, the agency's discretion is confined and guided by the provisions of the ICWA and, if the agency selects a placement which does not comport with the preferences of the act, it must justify its decision by establishing good cause for refusal to do so." (*In re Jullian B.* (2000) 82 Cal.App.4th 1337, 1345.) Here, there was no deviation from ICWA's preferences. Because ICWA's placement preference requirements were adhered to, good cause was not in issue, and we conclude the placement decision by the juvenile court was discretionary and should be reviewed only for abuse. Any of the court's factual findings relied upon in reaching the placement decision may be reviewed for substantial evidence. But ultimately the Indian child's placement was discretionary with the juvenile court and should not be disturbed absent abuse of that discretion. (See *In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067 [decision under § 361.3]; see generally *In re Caden C.* (2021) 11 Cal.5th 614, 639–641.)

### 3. Katie T.'s Indian identity and her connection to her Tribe

ICWA tells us: "The standards to be applied in meeting the preference requirements of this section shall be the prevailing social and cultural standards of the Indian community in which the parent or extended family resides or with which the parent or extended family members maintain social and cultural ties." (25 U.S.C. § 1915(d).) Accordingly, California has enacted section 361.31, subdivision (f), which makes a similar provision and adds: "A determination of the applicable prevailing social and cultural standards may be confirmed by the Indian child's tribe or by the testimony or other documented support of a qualified expert witness . . . who is knowledgeable regarding the social and cultural standards of the Indian community."

The court must consider the Tribe's requested placement if it is consistent with ICWA's preference tiers. (See *In re A.F.*, *supra*, 18 Cal.App.5th at p. 845.) The position taken by the Tribe in the custody

30

proceeding presumably also speaks to the "prevailing social and cultural standards" of its own community.  (§ 361.31, subd. (f).)

The court may also consider which home will most likely sustain the Indian child's connection to her tribe.  (*In re Alexandria P.*, *supra*, 1 Cal.App.5th at pp. 335, 351.)  Indeed, " 'it is in the Indian child's best interest that its relationship to the tribe be protected.' " (*Mississippi Band of Choctaw Indians v. Holyfield* (1989) 490 U.S. 30, 50, fn. 24.)  The California Rules of Court expressly provide that when a foster home cannot be found within one of the preference tiers specified in ICWA, "active efforts must be made and documented to place the child with a family committed to enabling the child to have visitation with 'extended family members,' . . . and participation in the cultural and ceremonial events of the child's tribe."  (Cal. Rules of Court, rule 5.485 (b)(8).)  The dependency court did not err in placing Katie T. where she would have the strongest connection to her Tribe and where the Tribe itself wanted her placed.

Congress found "there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children."  (25 U.S.C. § 1901(3).)  One of the national policies underlying ICWA is to promote "foster or adoptive homes which will reflect the unique values of Indian culture" through the provisions of the statutory scheme.  (25 U.S.C. § 1902.) In enacting ICWA, Congress expressly found "that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions" and further found "that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often

31

failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." (25 U.S.C. § 1901(4) & (5).)

Given these underlying findings and the express policy of ICWA, we think the court justifiably chose, in the case of two tier-one potential foster homes, to place the child in the home where she will be most closely connected with her Tribe. When placement of an Indian child is in issue, the tribe's preference, while not dispositive, is entitled to serious consideration. (See *In re A.F.*, *supra*, 18 Cal.App.5th at pp. 844–845.)

We have already described May E.'s commitment to instilling in Katie T. an identity with her Native American heritage. The trial judge properly gave weight to these cultural considerations in placing Katie T. in May E.'s home. In part due to the influence of her uncle, Katie T.'s Native American heritage will most reliably be reinforced through family customs reflecting tribal values in May E.'s home, and Katie T. will more regularly be exposed there to tribal culture and Native American extended family members. (See *In re Alexandria P.*, *supra*, 1 Cal.App.5th at pp. 335, 351.)

### 4. The court did not discriminate based on poverty

Mother suggests the court fell prey to improper anti-poverty bias when it chose May E.'s home for placement of Katie T. Indeed, Mother testified that she believed Katie T. was placed with May E. so she could be in a more "money-functioning" environment.

In reviewing the court's decision to place Katie T. in May E.'s home rather than Kate K.'s we cannot ignore that Kate K. was living in the house with the children when they were detained, and she failed to protect them from the unsanitary and dangerous conditions on the premises. Although Kate K. had custody of four of the children at disposition, the judge expressly stated she did not view Kate K. as a "safe harbor" for the children because of

her lack of insight into when Mother was on drugs or off her psychotropic medications. The court referenced the fire-starting incident and Kate K.'s failure to report it to the Agency. The court's skepticism about Kate K. was supported by substantial evidence. Subsequent events bear it out.[10] We see no reason to believe the judge's orders were the result of an anti-poverty bias.

### 5. Katie T.'s placement order was not an abuse of discretion

In making its placement choice, the court expressly considered the panoply of factors listed in section 361.3, subdivision (a)(1) through (a)(8) in determining that Katie T. should be placed with May E. The court also considered the Tribe's preferred placement choice and the relative strength of the tribal connection in the potential foster homes in deciding upon placement.

The ICWA expert testified it was especially important that Katie T.'s placement be as stable as possible, given her history in foster care from the age of one month. She had been in four different placements during the 2017 dependency. At her age and given her history, she needed consistency and security. England testified that moving children in foster care can be very traumatic, and the judge agreed.

---

[10] Just days before the disposition orders were signed the Agency detained the four older children from Kate K.'s care after investigating a referral for inappropriate physical discipline. The judge made clear she had not considered the new information in reaching her decision on disposition. Still, the five children were in five different foster homes as of April 28, 2020. The Agency was looking for foster homes that would accept siblings and needed alternative local placements for the additional reason that there had been an outbreak of COVID-19 cases in Covelo. The children's maternal grandmother, who was in compromised health, also lived in Kate K.'s home, so it was not safe to move the children back there. We have no information on the current whereabouts of those four children.

May E.'s home provided Katie T. with a stable environment, cultural connection to her Tribe, proximity to paternal extended family members, and proximity to a therapeutic daycare and therapeutic preschool. Such facilities were well-suited to serve Katie T.'s special emotional and psychological needs and could not be matched near Kate K.'s home. Katie T. also was living near her paternal half-sister, Kaylee.

Katie T. was thriving in May E's home and was well-bonded to her aunt and uncle. May E. reported that Katie T., when going to visitation with Mother and her siblings, once said she was "scared" and needed reassurance she would be coming back to May E.'s house. At disposition, the court found it would be "quite harmful" to Katie T. to remove her from May E.'s home. The court did not abuse its discretion in reaching its placement decision.

## D. *The Removal Orders Were Supported by Substantial Evidence*

### 1. The law

Under section 361, subdivision (c)(1), a child may not be ordered removed from parental custody unless the court finds, by clear and convincing evidence, that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's, guardian's, or Indian custodian's physical custody." Similarly, ICWA requires clear and convincing proof, including the testimony of expert witnesses, that, absent removal, the Indian child would suffer "serious emotional or physical damage" and "active efforts" had been made to prevent the "breakup of the Indian family." (25 U.S.C. § 1912(d) & (e); 25 C.F.R. § 23.121(a).)

Mother asserts that no substantial evidence supports the dependency court's findings that Katie T. and her four siblings remained at a substantial

risk of danger to their "physical health, safety, protection, or physical or emotional well-being" (or "serious emotional or physical damage") absent removal from her care at the time of the disposition orders. Because clear and convincing evidence was required in the dependency court (25 U.S.C. § 1912(e); §§ 361, subd. (c), 361.7, subd. (c)), we bear that standard in mind as part of our review for substantial evidence. (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at pp. 995–996, 1000–1012; *T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1238–1240.)

Here, in addition to a disposition report filed in December 2019, the Agency filed an addendum on February 4, 2020, consisting of service logs on face-to-face contacts between Mother and the social worker and on Mother's visitation with her children. The visits generally went well, and Mother's progress in taking advantage of services was deemed "adequate."

### 2. Substance abuse

Mother discusses her "past" substance abuse as though it is reliably behind her, but we note that both the 2017 dependency and the 2019 dependency began with Mother's relapse with methamphetamine, yet she still had not accepted at disposition that she had a serious drug problem. Mother consistently tested clean in drug tests, but she had never retreated from her position that taking one hit off a methamphetamine pipe was not "usage." She gave conflicting explanations of the circumstances of her relapse, saying once she took one hit off a meth pipe at a party, and on another occasion testifying that May E. had taken Katie T. and not brought her back when expected, which prompted Mother's relapse. She testified she had only used methamphetamine three times in the past nine years, which is inherently doubtful, given her history in dependency cases and her prior admissions. One concerning comment from the social worker in the February 2020 addendum was that, on December 10, 2019, Mother admitted she was

35

not taking her prescribed medications and said she was "coming out of the closet. I use meth." These potential warning signs gave the court more evidence for the removal orders.

### 3. Mental health issues

Mother was initially resistant to taking her psychotropic medications. She attributed her bipolar symptoms to personality traits and seemed reluctant to abandon those traits, acknowledging she was "a little high strung for most people, so they are trying to put a damper on me." Mother started seeing a mental health professional in reunification and received a new prescription for psychotropic medication for bipolar disorder in late November 2019. Although she testified that she had been taking her new medication regularly ever since, that amounted to at most four or five months by the time of the disposition orders. The court could reasonably conclude that the state of her mental health was not yet reliably established, and the children could not safely be returned to her.

### 4. Mother's refusal to admit she put her children at risk

Mother also never admitted that Kate K.'s home was unsafe for the children at the time of detention. She admitted maybe some tools should have been put away from the children, but the other conditions on the property she treated as inconsequential and not her responsibility. During the period just preceding the detention, Mother pitched her tent in the carport and virtually abdicated her responsibilities as a parent. She left those responsibilities for Kate K. to pick up, but Kate K. didn't oblige.

The result was a house dangerously ill-suited to healthy child-rearing, with three adults in the house, but none of them fully taking responsibility for the children. Mother testified that Kate K. was taking care of her children, yet Kate K. testified she was there to help but was not the primary caregiver. Though the death of Antonio T. no doubt hit Mother hard, the trial

court could reasonably conclude that her mental illness, being off her medications, and her possible drug use all played a part in her withdrawal from her children at such a crucial time. The judge could reasonably conclude that Mother's sobriety was not yet firmly rooted, her mental health not yet stabilized at the time of disposition, and her reliability in taking her medication not yet shown. Even Kate K. testified she was "less willing" this time to help Mother reunify with her children because she was "afraid it's going to happen again."

### 5. Lack of a housing plan for the children

By late February 2020, Mother still did not have a concrete plan for how she would safely house her children. She claimed to own a house trailer that would sleep at least six, but she had no clear plan about where she could park it long term. Mother called a friend of a friend to testify that he owned a piece of land where she could park her trailer for $100 a month. He evidently grew marijuana on the property but claimed it was locked up and not accessible to the children. The Tribe's social worker testified she was familiar with the witness (a member of the Tribe) and his property, and the Tribe would not consider it a proper place for children. The judge specifically found the man's evidence was not credible and found the trailer would not be safe and stable housing for the family or any component of the family. Mother talked about possibly moving her family to a cottage in Black Butte and also said she could move her trailer to her father's property in Willits. Mother mostly hoped to be allowed to return to live in Kate K.'s home, even though Kate K. was opposed. In short, Mother had a lot of ideas but no viable plan.

### 6. Alleged anti-poverty bias

Mother argues the court's order removing the children based on her "crowded or inadequate housing" violated ICWA and state law. (25 C.F.R.

§ 23.121(d) (2020); see *David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 795–796.) She denounces removal and placement decisions based on the poverty of the parent or the relative wealth of a foster home. (Cf. § 361.31, subd. (k); Cal. Rules of Court, rule 5.485(b)(5) [prohibiting "good cause" finding "based on the socioeconomic status of any placement relative to another"]; *In re G.S.R.* (2008) 159 Cal.App.4th 1202, 1212 [jurisdiction may not be asserted based solely on poverty resulting in homelessness]; *In re D.N.* (2020) 56 Cal.App.5th 741, 753–754, 764–765 [nonoffending, noncustodial father entitled to continuance to secure housing where minor doing poorly in group home repeatedly asked to live with father]; *In re S.S.* (2020) 55 Cal.App.5th 355, 373–377 [nonoffending, noncustodial father's parental rights erroneously terminated due to inability to secure housing].) " '[J]udges [and] social workers . . . have an obligation to guard against the influence of class and life style biases.' " (*In re G.S.R.*, at p. 1212.)

The case law supports Mother's position only if poverty was the *sole* basis for the challenged order. (*In re G.S.R.*, *supra*, 159 Cal.App.4th at p. 1212 ["the *only* reason [father] did not obtain custody of the boys was his inability to obtain suitable housing for financial reasons"]; *In re D.N.*, *supra*, 56 Cal.App.5th at p. 765 ["father's lack of housing was the only barrier to reunifying with" his son]; *In re S.S.*, *supra*, 55 Cal.App.5th at p. 376 ["father couldn't regain custody of [the minor] because of his economic situation, not his parenting ability"].)

Mother's lack of financial wherewithal to secure housing was not the only reason for the removal orders. The uncertain status of Mother's mental health, her questionable commitment to continue her prescribed medication, and her inconsistent attitude about drug use added to the picture supporting the judge's removal orders. With respect to housing, Mother had a

scattergun approach to solving the problem, which may stem from her mental illness. The record contains little financial information to support Mother's claim of poverty as the root of the problem. Her claim on appeal cannot succeed without a record of poverty as the sole barrier to reunification.

### E. *The Order Making Mother Responsible for "Getting to Visits" with Katie T. Was an Abuse of Discretion*

One provision of Katie T.'s visitation order troubles us. The judge ordered: "The mother is responsible for getting to visits." Mother challenges this provision. To the extent the judge intended to impose on Mother the full financial responsibility of travel to San Diego for visitation, the order was unsupported by substantial evidence of Mother's ability to pay. Imposing on her the financial burden of visitation with Katie T. could be an insurmountable obstacle to their visitation, which would constitute a barrier to reunification. That would be presumptively contrary to ICWA and inconsistent with the court's own order allowing Mother reunification services. (Cf. *Anthony T.*, *supra*, 208 Cal.App.4th at p. 1031; § 361.31, subd. (g).)

If the judge intended only to impose on Mother the sole obligation to make the trip to San Diego for visitation—to save Katie T. a long trip in the car—it would be lawful, since her willingness to undertake that obligation may be one measure of her commitment to reunify, but we do not think the order can be read in so limited a way. The visitation arrangements in place before disposition allowed for at least four face-to-face visits per month and were among the factors that led us to conclude May E.'s house was reasonably found to be in reasonable proximity to Kate K.'s house. The premises on which we based our holding also included the Agency's offer to provide airline tickets for Mother to travel to San Diego for biweekly visitation. (See pt. I.C.5., *ante*.)

39

To leave Katie T. placed in San Diego but to impose upon Mother the sole responsibility of "getting to visits" was an abuse of discretion. We shall strike the offending sentence. Our order shall not preclude the juvenile court from making future travel orders to facilitate visitation between Mother and Katie T. at least four times per month (for at least eight hours of visitation, as already ordered), consistent with the child's best interests, including future orders allocating travel expenses equitably.

## F. *Because We Do Not Disturb Any Child's Disposition Orders, We Need Not Consider the Conditional Relief Mother Seeks*

Mother's final issue is contingent upon our providing relief to one or more, but not all, of her children in response to one of her other arguments. Because we have not provided such relief, we need not address her third issue.

## III. DISPOSITION

The appeal in No. A159220 is dismissed. In No. A160139, the November 27, 2019 placement order for Katie T. is affirmed. The April 28, 2020 disposition orders filed May 6, 2020, are affirmed for all the children, except the following sentence must be stricken from the visitation order for Katie T.: "The mother is responsible for getting to visits."

STREETER, J.

WE CONCUR:

POLLAK, P. J.
BROWN, J.

40